IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA *ex rel*,
CLIFF BERGLUND,

                     Plaintiff,

        v.

THE BOEING COMPANY,

                    Defendant.

_____

03:02-cv-193-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Opinion and Order*

      Relator, Cliff Berglund, filed a Third Amended Complaint ("TAC") alleging defendant, The

Boeing Company ("Boeing"), committed fraud on the United States government pursuant to the *qui*

*tam* provisions of the False Claims Act  ("FCA"), 31 U.S.C. §§ 3729-3733, and violated the Act's

retaliation provision.  In Count One of the TAC, Berglund alleges, among other things, that Boeing

1 – OPINION AND ORDER

submitted false claims to the United States by delivering contractually nonconforming aircraft parts to agencies of the United States. Specifically, Berglund alleges mistakes were made by shop floor personnel at Boeing's Portland facility in complying with internal Boeing specifications for the production of commercial aviation parts. Berglund maintains the errors were documented in Boeing's quality system. The United States declined to intervene in this action on July 1, 2005. On May 4, 2010, the parties stipulated that Count One of the TAC be dismissed with prejudice to Berglund and without costs to any party.

In Count Two of the TAC, Berglund alleges Boeing engaged in retaliatory conduct because he sought to rectify Boeing's violations of its aircraft contract requirements and because he reported Boeing's malfeasance to the federal government. Additionally, Berglund alleges Boeing discriminated against him in the terms and conditions of his employment because of the lawful acts he pursued in furtherance of actions brought under the False Claims Act. (Third Am. Compl. ¶¶ 140-141.)

Pursuant to FED. R. CIV. P 56(a), Boeing moves the court to enter judgment against Count Two of Berglund's TAC on the ground that most of Berglund's retaliation claims are barred by the statute of limitations and the remaining allegations are "indisputably false." (Def's Mot. Summ. J. 1-2.) In addition, Boeing moves for sanctions against Berglund for an alleged "campaign" to alter, conceal and destroy evidence and give false testimony under oath. (Def.'s Mot. Sanctions 2.) Oral argument was heard on Boeing's Motion for Summary Judgment and Motions for Sanctions and, for the reasons that follow, Boeing's request for summary judgment is denied and its request for sanctions is granted.

*Factual Background*

Berglund is a manufacturing planner at Boeing and he began working there in 1979. (Doug Hanna Decl. Ex. B, Nov. 15, 2010.) At the start of 2001, Berglund held the position of DGKJT Manufacturing/Engineer Planner Level 4. (Hanna Decl. Ex. B at 3.)

In his declaration, Berglund states that in late 2000, he learned one or more Boeing subcontractors were omitting a critical cleaning process in the manufacture of certain titanium alloys. (Cliff Berglund Decl. ¶ 4, Jan. 31, 2011.) Boeing denies this allegation.

In February 2001, Berglund, along with Jeffrey Biron, filed an initial lawsuit against Boeing and other defendants pursuant to the FCA. *See United State ex rel Jeffrey Biron and Cliff Berglund v. QPM Aerospace, Inc., The Boeing Company, et al.*, CV No. 01-163-KI ("*Biron and Berglund*"). This original action included a claim by Biron for retaliation, but not a retaliation claim by Berglund. Although Biron and Berglund presented the Complaint to this court as a sealed document, the Clerk of the court mistakenly posted the Complaint on the court's website where it remained for a few days, available for public viewing. (David Hollander Decl. ¶ 3, Feb. 1, 2011.) Boeing learned of the lawsuit while it was posted on the Court's website and available for public view. (Berglund Decl. ¶¶7-8; Larry Payette Decl. ¶¶ 2-4, Jan. 30, 2011.) Berglund alleges one of his mangers, Lorenzo Ontiveros, had a copy of the *Biron and Berglund* Complaint on or about February 2001. (Berglund Decl. ¶¶7-8; Payette Decl. ¶¶ 2-4.)

Fifteen months later, on June 4, 2002, a Second Amended Complaint was filed in *Biron and Berglund*, alleging Boeing retaliated against Berglund for his FCA activities.[1] (Calvin Keith Decl.

---

[1]Berglund first alleged his § 3730(h) claim against Boeing in the First Amended Complaint ("FAC") in *Biron and Berglund*, filed on February 4, 2002. *See U.S. ex rel Jeffrey Biron and Cliff Berglund v. QPM Aerospace, Inc., The Boeing Company, et al.*, CV No. 01-163-

Ex. A at ¶¶ 103-05, Nov. 15, 2010.)  Subsequently, in May 2004, Biron and Berglund voluntarily dismissed this initial case.

Berglund filed the present action on February 15, 2002, and the Complaint contained only one claim for relief for violations of the FCA; it did not allege a claim for retaliation.  (Keith Decl. Ex. B at ¶¶ 5-32.)  Over two years later, on May 17, 2004, Berglund filed a Second Amended Complaint ("SAC"), to add a count of retaliation under the whistleblower provision of the FCA, 31 U.S.C. § 3730(h). (Keith Decl. Ex. C at 32.) Subsequently, Berglund abandoned his allegations that Boeing committed fraud on the government.  (Keith Decl. Ex. G.)  As a result, the only remaining claim in this case is Berglund's retaliation claim.

In his SAC, Berglund alleges numerous instances of  retaliation.  (Keith Decl. Ex. C at ¶¶ 129-139.)  According to Boeing, most of these events took place before May 17, 2003, one year prior to Berglund filing his SAC adding the retaliation claim.  For example, Berglund claims that "[a]fter February 2001" he "applied for and was denied managerial advancement on dozens of occasions."  (Keith Decl. Ex. C at ¶ 134.)  Also, "Relator Berglund was stripped of many of his job responsibilities as a lead/Focal Manufacturing Engineering Planner."  (Keith Decl. Ex. C at ¶ 134.) Finally, Berglund further alleges in March 2002, he was "demoted to a lesser job grade with lesser responsibilities."  (Keith Decl. Ex. C at ¶ 136.)

According to Boeing, Berglund claims only two instances of retaliation that allegedly took place after May 17, 2003, and two instances in the year between May 17, 2002, and May 17, 2003.  First, Berglund claims that "[s]ince at least the 3rd QTR 2002 Relator's supervisors have been

---

KI (Doc. # 16, First Amended Complaint, February 4, 2002).  The FAC was filed under seal and never served on Boeing.

monitoring Relator's work assignments are [] being monitored, graphed and being [sic] over scrutinized." (Keith Decl. Ex. E at 9.) Second, he was assigned a lower retention rating in November 2002 following a yearly review. (Hanna Decl. Ex. B at 3.) Third, in April 2003, his home and vehicle were vandalized. (Keith Decl. Ex. E at 9.) Lastly, he was laid off in September 2003. (Keith Decl. Ex. C at ¶ 138.)

Berglund is a member of he Society of Professional Engineering Employees in Aerospace ("SPEEA"), a union that represents engineers and other technical professionals in the aerospace industry, including those working at Boeing. (Deborah Sternberg Decl. ¶ 2, Nov. 15, 2000.) SPEEA and Boeing negotiated collective bargaining agreements governing the terms of employment for SPEEA members. (Sternberg Decl. ¶ 2.) Berglund asserts that as a SPEEA member he cannot be terminated, suspended, or otherwise disciplined except for good cause. The collective bargaining agreement, however, sets forth a procedure for deciding which employees will be let go when layoffs are necessary. (Sternberg Decl. ¶¶ 3-5.)

Under these procedures, roughly once a year managers evaluate all employees, who are then ranked against all those within the same organization, skill code, or job classification and level. (Sternberg Decl. ¶ 3; Hanna Decl. ¶ 2.) The parties agree Berglund is subject to periodic reviews that should take place once each year. However, Berglund contends that at times his yearly evaluations either did not occur or took place more frequently than once a year. Employees are assigned one of three ratings, R1-R3, with R1 as the highest and R3 as the lowest. (Sternberg Decl. ¶ 3; Hanna Decl. ¶ 3.) These rankings are assigned according to a forced distribution system, which requires about 40 percent of employees to be rated R1, 40 percent to be rated R2, and 20 percent to be rated R3. (Sternberg Decl. ¶ 3; Hanna Decl. ¶ 3.)

According to Boeing, it independently evaluates whether layoffs are necessary and, if so, the scope and size. If Boeing determines layoffs are necessary, it implements the order of layoff using the ratings system. (Sternberg Decl. ¶¶ 5,7.) Generally, those rated R3 will be laid off before those rated R2, and those rated R2 before those rated R1. (Sternberg ¶ 7.) Berglund concedes layoffs are designed to occur in this manner, but insists his retention rating was manipulated by Boeing to ensure he would be laid off at the first available opportunity.

At the end of 2000, just weeks prior to the filing of the *Biron and Berglund* Complaint, Boeing reviewed Berglund for the calendar year 2000. In that performance review, Berglund's supervisor, Fred Reynolds, stated:

> You worked on some significant initiatives this year with high success.
> • Initiated testing process towards the implementation of "fatigue Technology ForceMate" method of bushing installation for our engine mounts. I know you are working on a demonstration for Jan. 2001. The benefits could be far reaching.
> • 747 Carriages
>> • Lg - elimination of (4) holes/part that are not being used on the plane. Not only will this save time in not having to put in the holes and additional steps, it will eliminate R/Ts. There are (16) holes per S/S. Status - waiting on BMT memo #.
>> • Sm - You met with Everett Planning and Engineering on climinating (1) Part number/configuration (65B08026-) for the outboard. This will make it cheaper and simpler through all the shops. Effective LN1278.
> •Standardization of PCUs – After much work you were able to stabilize the PCUs generated for our products. This will help us in forecasting requirements and costs, and can now be used to help other business team with their PCUs. Thank you for your support.

(Second Cliff Berglund Decl. Ex. 16-1, Jan. 31, 2011.)

Berglund insists that, prior to the February 2001 filing of the *Biron and Berglund* matter, his reviews and commendations demonstrated continuing improvement, increasing responsibilities and promotions. According to Berglund, his supervisors, and others, described him as supportive of the departmental and company goals of continuous improvement, promoting teamwork and use of

people skills.  (Second Berglund Dec. Exs. 9-11.)  Examples of Berglund's commendations prior to February 2001, include:  acknowledging his contribution, individually and as part of team, for going "a long way in keeping the Boeing Company's position of leadership in the aircraft industry[]" (Second Berglund Dec. Ex. 17)[2]; acknowledging his "professionalism and desire to get the job done" as being "instrumental in accelerating the development, testing and process implementation" for an outside vendor on "one of its most difficult projects . . . []"  (Second Berglund Dec. Ex. 18); being commended for his "sincerity and professionalism" and described as "patient," demonstrating "effective leadership skills" and "pleasurable to work with[]" (Second Berglund Dec. Exs. 19, 20-1); a thank you from Boeing for his "assistance in demonstrating [Boeing's] competitive edge[]" (Second Berglund Dec. Ex. 20-2); and, describing his "customer satisfaction" as "above average" and "improving."  (Second Berglund Dec. Ex. 15-2.)

Despite the foregoing statements during Berglund's annual reviews and commendations prior to 2001, Boeing charges Berglund's reviews prior to the filing of the Complaint in *Biron and Berglund* reveal concerns with insubordination and poor interaction with coworkers.  Additionally, Boeing alleges Berglund received corrective action memoranda before and after filing the action. Nevertheless, Berglund insists that, prior to February 2, 2001, there is no evidence of the type of behavioral and performance problems Doug Hanna, Berglund's direct supervisor since August 2002, attributes to Berglund; nor is there evidence Berglund was ever counseled, criticized or disciplined for the type of behavioral and performance problems attributed to him by Hanna.  (Berglund Dec. ¶ 37.)

Following the events of September 2001, Boeing suffered heavy losses and was forced to

---

[2]Exhibit 17 to the Second Berglund Declaration does not include a date.

implement layoffs.  (Sternberg Decl. ¶ 5.)  The post-September 2001 layoffs were implemented using the ratings system.  (Sternberg Decl. ¶¶ 6-7.)  All employees in Berglund's position and with his retention rating were laid off.  (Sternberg Decl. ¶ 8.)

Boeing insists Berglund was assigned his retention rating in November 2002, prior to asserting his retaliation claims in this case.  (Hanna Decl. Ex. B at 3.)  Additionally, Berglund had been assigned an R2 rating in May 2001, and an R1 rating in March 2002.  (Hanna Decl. Ex. B at 3-4.)  Berglund was rehired approximately one year after he was laid off.  (Hanna Decl. Ex. B at 3.) Between his rehiring in 2004, and the present, Berglund  has received all three ratings at various times.  (Hannah Decl. Ex. B at 1-3.)  When questioned about why Boeing would at times raise his retention rating if the company were retaliating against him, Berglund testified:

> Q.    In this nine-year period since you've filed your lawsuit, whenever there's a retention rating that goes down, you attribute that to retaliation for your lawsuits; every time it goes up, it's either your work performance, or just the nature of the force[d] distribution process; is that correct?
>
> . . . .
>
> A.    I believe that is correct.
>
> . . . .
>
> Q.    We went through all these examples, and we can go over them again. But when I asked you about the retention drops, you attributed the cause to retaliation. And when I asked you about the retention improvements, you attributed the cause to either your performance, or the nature of the way the contract works, correct?
>
> A.    That's correct.

(Keith Decl. Ex. F (Cliff Berglund Dep. 908:6-909:7, Jan. 28, 2010) (hereinafter "Berglund Dep.").)


Boeing maintains it is undisputed Berglund received his low ratings because he was a poor

employee.  For example, Hanna, Berglund's direct supervisor, wrote in a 2002 evaluation:  "Never in my management experience have I encountered such consistent and intense customer dissatisfaction with an employee.  I was unable to locate a single customer or peer that wanted to work with you."  (Hanna Decl. Ex. A)  Several other of Berglund's supervisors and  customers delivered similar criticisms.  In fact, one of Berglund's yearly reviews included the following comments from various customers:

❏ I went to his manager several months ago and asked to have him replaced.  He is so bad that I have to believe he's screwing things up on purpose.  No one could be this stupid.

❏ Cliff is untrustworthy and will lie when the truth will do better.

❏ Cliff is arrogant, condescending & argumentative.

❏ Please move him somewhere that I will never have to deal with him again.

❏ Cliff is extremely difficult to work with.  He doesn't listen & wants to do things his way.

❏ Cliff Berglund is very uncooperative.

❏ Customer satisfaction is terrible!

❏ Very difficult to work with!

❏ I would prefer to never work with Cliff again.  Please get me another planner to work with!

❏ Comes across as very arrogant.  Seems to focus exclusively on proving his point rather than honestly looking for the right answer.

❏ Incredibly bad teamwork . . . arrogant, defensive, condescending.

(Hannah Decl. Ex. C.)

Additionally, Berglund has also received numerous corrective action reports while at Boeing. For example, he has been cited for viewing sexually explicit material on his work computer on

9 – OPINION AND ORDER

company time.  (Hanna Decl. Ex. D1 at 1.)  Berglund was subject to discipline for allowing a nonconformity to escape Boeing's Portland plant.  (Hanna Decl. Ex. D2 at 7.)  He was criticized for creating faulty planning in March 2003.  (Berglund Dep. 937:21-938:18.)

Berglund alleges that, beginning in approximately April of 2001, Boeing commenced a pattern of harassment and retaliation examples of which included:

a.      In or about April, 2001 Berglund received a corrective action memo from his supervisor, Reynolds.  This memo accused him of failing to inform management of the effects of nitric fluoride acid etching on titanium parts.  Berglund alleges in his declaration he had previously notified both Support Team Mangers, Dennis Gessler and Kevin Kruger, not to accept these parts because the etching process would change the dimensions of the parts.  (Berglund Decl. ¶9.)

b.      Berglund further alleges, by the end of 2001, Boeing had significantly reduced Berglund's job responsibilities.  In December 2001, Berglund's retention rating was downgraded from R2 to R3.  (Berglund Decl. ¶¶ 12-14.)

c.      Berglund alleges, in or about September 2001, Ontiveros, the Quality Assurance General Manager, twice requested he make unauthorized changes to D6-1276 (flight critical) parts, which Berglund refused to do.  According to Berglund, making such changes would have subjected him to disciplinary action up to and including termination.  (Berglund Decl. ¶ 10.)

d.      Berglund claims, in October 2001, under the pretense of a reorganization, Berglund was removed from the position that he held for the previous 12 years, Lead/Focal Manufacturing Planner for the Engine Mount/Flap Carriage Business Team.  Berglund further alleges he was divested from all responsibilities for his product focus, and no similarly situated Lead Manufacturing Planner in Portland was removed from their product focus.  Berglund was reassigned responsibility

for four part numbers for 747 flap carriages and two part numbers for 737 Classic spare flap carriages. The 747 parts were in only limited production and the 737 parts were not in production at all. Thus, Berglund, in essence, had nothing to do. Further, as a consequence of his reassignment Berglund was no longer performing work consistent with his Level 4 skill grade. (Berglund Decl. ¶¶ 12-14.)

e.        On or about March 6, 2002, Berglund was informed his job title of Level 4 Manufacturing Engineer/Planner was to be eliminated and he had the choice of a downgrade to a Level 3 Manufacturing/Engineer Planner or termination, to which Berglund chose the down grade. (Berglund Decl.¶ 27.)

f.        At the time of Berglund's downgrade to Level 3, there were two other indiviudals at Boeing Portland with the classification of Level 4 Manufacturing/Engineer Planner, Dave Sasseen and Toby Tyler. Berglund alleges neither Sasseen nor Tyler were downgraded to a Level 3 Manufacturing/Engineer Planner and, rather, both retained their Grade Level 4 and were given positions in a newly created job classification of Product Manager. (Berglund Decl. ¶ 28.)

g.        Berglund alleges he asked his managers whether there was any more Level 4 work in Portland and was told "yes," but it was to be performed by individuals with the "Product Manager" classification. (Berglund Decl. ¶ 27.)

h.        Berglund alleges his complaints to Susan Miller in Boeing Portland Human Resources have gone unanswered. (Berglund Decl. ¶¶ 30-32.)

i.        In August 2002, Hanna became Berglund's manager. Berglund admits he received a "scathing review" from Hanna at the end of 2002. Berglund charges, however, that Hanna's

11 – OPINION AND ORDER

review was not constructive and was a personal attack intended to lower Berglund's morale and encourage him to quit his position at Boeing. Further, Berglund claims Hanna's 2002 review was not in Boeing's usual format, which would allow him an opportunity to address the criticisms and provide his thoughts and feedback Additionally, Berglund claims neither Hanna nor any previous supervisor ever counseled or disciplined him for the type of behavior set out in the "Customer Comments re: Cliff Berglund Performance" document. Following the November 2002 review by Hanna, Berglund's retention rating was downgraded from an R2 to and R3, which was raised to an R2 based on Berglund's seniority. (Berglund Decl. ¶¶ 35-38; Hanna Decl. Ex. C.)

j.     Berglund remained in that position until July 19, 2003, when Boeing issued a Workers Adjustment and Retraining Notification ("WARN") advance notice of termination effective September 19, 2003. (Berglund Decl. ¶ 40.)

Berglund was rehired approximately one year after he was laid off. (Hanna Decl. Ex. B at 3.) He was recalled pursuant to a provision in the collective bargaining agreement allowing those laid off to be eligible for priority recall if openings become available, even though Boeing had the option of taking him off the priority recall list. (Sternberg Decl. ¶ 9.)

*Legal Standard*

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. *Id*. at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 255 (1986).

*Discussion*

The FCA is a statutory scheme intended to discourage fraud against the federal government. Under the FCA, a private individual is authorized, among other things, to bring an action on behalf of the United States against any entity that has knowingly presented a false or fraudulent claim to the government. *See, e.g., United States ex rel. Anderson v. Northern Telecom*, 52 F.3d 810, 812-813 (9th Cir. 1995). Section 3729(a)(1)(A) is violated by one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[.]" Section 3729(a)(1)(B) is violated by one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property . . . ." *Id.* at 3729(b)(2). Such an action is termed a "*qui tam*" action and is most often filed by an insider at a private company who discovers his employer has overcharged under a government contract; supplied substandard products or services; engaged in false negotiation, including bid rigging and defective pricing; or provided false certification of compliance with federal law. *See Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (and cases cited therein).

In 1986, Congress amended the FCA, to include an anti-retaliation provision to protect whistleblowers. False Claims Amendments Act of 1986, Pub. L. No. 99–562, § 4, 100 Stat. 3153, 3157–58. The FCA protects employees from being "discharged, demoted, . . . or in any other manner discriminated against in the terms and conditions of employment . . . because of lawful acts done by the employee . . . in furtherance of an [FCA] action . . . including investigation for, initiation of, testimony for, or assistance in an [FCA] action. . . ." 31 U.S.C. § 3730(h). The purpose of §

3730(h) is to promote enforcement of the FCA by "assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts." S.Rep. No. 99–345, at 34, 1986 U.S.C.C.A.N. 5266, 5299 (1986). Section 3730(h) is referred to as the whistleblower provision of the FCA. *See, e.g., Hopper*, 91 F.3d at 1269 ("Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." citing S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5299.))

In Count One of the TAC Berglund alleges Boeing violated two substantive provisions of the FCA: 31 U.S.C. §§ 3729(a)(1) and (a)(2).[3] Berglund's FCA claim is grounded in allegations that Boeing disregarded manufacturing requirements that resulted in the production of nonconforming parts. These nonconforming parts were then certified as meeting specifications and sold to the United States. Although Berglund subsequently entered into a stipulated dismissal of

---

[3]Section 3729(a)(2) provides:

Reduced damages. – If the court finds that –

(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B) such person fully cooperated with any Government investigation of such violation; and

(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

Count One, he alleges in Count Two of the TAC that Boeing violated § 3730(h) of the FCA when it in engaged in retaliatory conduct because "Berglund sought to rectify Boeing's violations of its aircraft contract requirements, and because [] Berglund reported Boeing's malfeasance to the United States." (Third Am. Compl. ¶ 139.)  Additionally, Berglund claims he was "discriminated against in the terms and conditions of his employment by Boeing . . . because of lawful acts done by him in the furtherance of actions brought under the False Claims Act." (Third Am. Compl. ¶ 140.)

Boeing seeks an entry of judgment against Berglund's whistleblower claim on the grounds that most of Berglund's retaliation allegations are time barred and the remainder fail to present a disputed issue of fact of the necessary retaliation elements.  Thus, before reaching the merits of Berglund's retaliation claim, the court must resolve two threshold questions:  (1) the applicable statute of limitations; and (2) the date the limitations period was tolled.

I.    Applicable Limitations Period

Boeing seeks an entry of judgment against Berglund's whistleblower claim on the grounds that most of Berglund's retaliation allegations are time barred and the remainder fail to present a disputed issue of fact on the necessary retaliation elements.  *See* 31 U.S.C. § 3731(b) ("A civil action under section 3730 may not be brought . . . more than 6 years after the date on which the violation . . . is committed . . . .")  In *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409 (2005), the Supreme Court determined the six-year limitations period set forth in 31 U.S.C. § 3731(b) did not govern actions for retaliation under § 3730(h); rather, the "most closely analogous state limitations period applies." *Id*. at 411.  As such, Boeing contends either Oregon's Whistleblower Protection Statute, OR. REV. STAT. § 659A.199, with a one-year statute of limitations, *see* OR. REV. STAT. § 659A.885(2) and OR. REV. STAT. § 659A.875(1)); or Oregon's

common law tort for wrongful discharge, which relies on Oregon's two year catch-all limitations period, *see* OR. REV. STAT § 12.110(1), applies to Berglund's § 3730(h) claim.  According to Boeing, application of either limitations period excludes as time-barred most of Berglund's allegations in support of his retaliation claim, which was filed on May 17, 2004.  Additionally, Boeing argues Berglund's retaliation claim does not relate back either to the original Complaint in this case, filed in February 2002, or the Second Amended Complaint in *Biron and Berglund*, filed in June 2002.

Boeing urges the court to apply a limitation period that was not in effect at the time Berglund's retaliation claim arose.  As stated above, Boeing contends the court should apply the one-year limitations period used for Oregon's "Whistleblowing" statute.  *See* OR. REV. STAT. § 659A.199. Section 659A.199, titled "Whistleblowing," makes it "an unlawful employment practice" to "discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for" employees who "in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation," which tracks closely the whistleblower provision in the FCA.  *See* 31 U.S.C. § 3730(h).  Boeing acknowledges § 659A.199 applies to cases filed after January 1, 2010 (*see* 2009 Or. Laws, c. 524, § 2), and Berglund "may protest that it is somehow unfair or retroactive to apply a statute of limitations passed in 2009 to a claim filed in 2004."  (Def's. Mem. Summ. J. 12.)  According to Boeing, however, Berglund's objections to a retroactive application of the one-year limitations period for § 659A.199 are meritless.  Boeing argues, first, the court should apply the law existing at the time of decision, not the time of filing, and, second, "the effective date is irrelevant because the statute of limitations is being ***borrowed*** as

a matter of federal common law; it is not being applied as a matter of Oregon law." (Def.'s Mem. Summ. J. 12 (emphasis in original).) Finally, Boeing insists there is nothing "exceptionally unfair" about applying the one-year statute of limitations here.

It is clear the one year limitations period for § 659A.199 (*see* OR. REV. STAT. §§ 659A.885(2) and 659A.875(1)), should not apply here. The Oregon Legislature expressly stated its intent that § 659.199A apply only to "actions commenced on or after the effective date of this 2009 Act," which was January 1, 2010. *See* 2009 Or. Laws, c. 524, § 2. *See also Riofrio v. Del Monte Fresh Produce N.A., Inc.*, CV 10-562-HA, 2010 WL 4536794, *4 (D. Or. Nov. 2, 2010) ("The statute expressly states that it is intended to apply to actions that are filed after the effective date of January 1, 2010."); *Duran v. Window Products, Inc.*, No. CV 10-125-ST, 2010 WL 6420572, *5-6 (D. Or. Dec. 22, 2010) ("Simply because Legislative Counsel excluded this effective-date clause from the text of ORS 659A.199 does not allow this court to ignore it."), adopted 2011 WL 126190 (D. Or. Mar. 29, 2011). *See also Chenault v. U.S. Postal Service*, 37 F.3d 535, 539 (9th Cir. 1994) ("A newly enacted statute that shortens the applicable statute of limitations may not be applied retroactively to bar a plaintiff's claim that might otherwise be brought under the old statutory scheme because to do so would be manifestly unjust.").

Berglund also urges the court to apply a limitations period not in effect at the time his retaliation claim arose. Specifically, Berglund maintains the appropriate limitations period is the three-year period now contained in § 3730(h)(3), *as amended* in 2009, and implemented on October 18, 2010. Section 3730(h)(3) provides: "A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred." Berglund argues Congress has explicitly included a statute of limitations for retaliation claims brought under § 3730(h) and, thus,

it is nonsensical for the court to apply Oregon's one-year limitations period. Simply, there is no need to search for the most-closely-analogous state statute because the federal statute of limitation directly applies to the claim at issue.

The law is well established that if Congress has not supplied a limitations period for a federal cause of action, the courts are to apply the most closely analogous statue of limitations under state law. *See, e.g., Reed v. United Transp. Union*, 488 U.S. 319, 323-24 (1989) (and cases cited therein). As mentioned above, in 2005, the Supreme Court concluded Congress had not supplied a statute of limitations for FCA retaliation claims, and directed courts to "borrow" the statute of limitations governing the closest analog under state law. *Graham County*, 545 U.S. at 417–18. Subsequently, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd–Frank Act"), Pub. L. No. 111–203, 124 Stat. 1376, which amended the FCA to supply an express statute of limitation for § 3730(h) retaliation claims. Consequently, the FCA now provides that "[a] civil action under [ § 3730(h)] may not be brought more than 3 years after the date when the retaliation occurred." 31 U.S.C. § 3730(h)(3). The question for the court, one of first impression in the Ninth Circuit, is whether the new FCA limitations period should apply retroactively to Berglund's retaliation claim.

It appears only a handful of courts have addressed the retroactivity question in this context, *i.e.*, whether the statute should be applied retroactively even though the amendment was not in effect either at the time Berglund's cause of action accrued or at the time he filed this action. *See Dyer v. Raytheon*, No. 08-10341-DPW, 2011 WL 3294489 (D. Mass. July 29, 2011) (court declines to "embark on a discussion whether the new limitations period in the Dodd-Frank Act applies . . . because application of the federal or a state statute of limitations" resulted in same outcome);

*Saunders v. District of Columbia*, 789 F. Supp. 2d 48 (D. D.C. 2011) (in *dicta* court indicates Congress' specification of the applicable statute of limitations in the Dodd–Frank Act obviates the need to resort to the "borrowing" doctrine); *Lindsay v. Technical Coll. Sys. of Georgia*, No. 1:09-CV-2133-JEC, 2011 WL 1157456, at *6 (N.D. Ga. Mar. 29, 2011) (court declines to resolve the issue on the merits); *Riddle v. DynCorp Int'l Inc.*, 733 F. Supp. 2d 743, 747–48 (N.D. Tex. 2010) (court summarily concludes the FCA limitations period does not apply because of § 4 statement that it is intended to take effect one day after its passage). *But see Pezza v. Investors Capital Corp.*, 767 F. Supp. 2d. 225 (D. Mass. 2011) (provision of Dodd-Frank Act amending the whistleblower protection set forth in the Sarbanes-Oxely Act by banning pre-dispute arbitration agreements applies to conduct that arose prior to its enactment).

In *Chenault*, the Ninth Circuit addressed the effect of an amendment to the Civil Rights Act of 1964 that extended the statute of limitations on previously time-barred claims.  A postal worker brought suit against his employer for constructively discharging him from his position by failing to provide him with a reasonable accommodation for his handicap under the Rehabilitation Act of 1973.  37 F.3d at 536.  The employee did not file a failure-to-accommodate claim within thirty days of the final administrative decision, as required by the statute at that time, and the district court ruled his claim was time-barred.  *Id*. at 536-37.

While his constructive discharge claim was pending, Congress extended from thirty to ninety days the time in which a plaintiff may file suit after a final administrative decision is rendered.  *Id*. at 537.  The employee in *Chenault* argued his failure-to-accommodate claim was revived under the newly enacted statute of limitations.  *Id*.  The Ninth Circuit held that to apply the new statute of limitations retroactively would "alter the substantive rights" of a party and "increase a party's

liability," as the party would be "forced to defend an action that was previously time-barred." *Id*. at 537, 539. Simply put, "a newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive plaintiff's claim that was otherwise barred under the old statutory scheme." *Id*. at 539.

In, *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 950-52 (1997), a case involving the retroactive application of an amendment to the FCA, the Supreme Court indicated its approval of the Ninth Circuit's holding in *Chenault*. As stated above, the FCA permits suits by private parties on behalf of the United States against anyone who submits a false claim to the government. 31 U.S.C. § 3730(b). The provision at issue permitted *qui tam* actions to proceed based on information already in the government's possession. *Hughes Aircraft*, 520 U.S. at 945-46. The parties agreed if the amendment did not apply, plaintiff's claims were barred. *Id*. at 945. In comparing its case to the circumstances in *Chenault*, the Court stated "[t]he [newly-enacted] amendment would revive that action, subjecting [defendants] to previously foreclosed . . . litigation, much like extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action." *Id*. at 950 (citing *Chenault*, 37 F.3d at 537).

Although, the present action is distinguishable because the retroactive application of the limitations period set forth in § 3730(h)(3) would not require Boeing to defend a previously time-barred claim, absent controlling authority, the court declines to apply § 3730(h)(3) here. Instead, after a careful review of the parties' respective arguments regarding the applicable limitations period for Berglund's § 3730(h) claim, and the Supreme Court's direction in *Graham*, the court concludes Oregon's two-year catch-all limitations period, *see* OR. REV. STAT § 12.110(1), applicable to state law claims for wrongful discharge, applies to Berglund's retaliation claim under

the FCA.  *See Graham*, 545 U.S. at 419 and n.3.  ("[W]e borrow the most closely analogous state

time limit absent an expressly applicable one. . . . The likely analogous state statutes of limitations

virtually all start to run when the cause of action accrues – in retaliation actions, when the retaliatory

action occurs." (citing, among others, OR. REV. STAT. § 12.110.(1)).

The record in this case establishes Berglund filed a Motion for Leave to File a Second

Amended Complaint to allege a § 3730(h) claim against Boeing on April 30, 2004.  The motion was

granted on May 4, 2004, and Berglund filed the SAC on May 17, 2004.  Thus, the limitations period

for Berglund's retaliation claim was tolled on April 30, 2004, upon filing the motion for leave to

amend accompanied by the proposed amended complaint.  *See Wells Fargo Bank, N.A. v. Renz*, No.

C. 08-02561-SBA, 2011 WL 97649, *8 (N.D. Cal. Jan. 12, 2011) ("Plaintiff, however, filed its

motion for leave to file the TAC on September 8, 2009, which, based on the face of the TAC, is

within the limitations period.")

II.    <u>Tolling Date for the Two-Year Limitations Period</u>

Nevertheless, Berglund makes several arguments in support of his contention that none of

the alleged retaliatory acts are time-barred, even under the Oregon two-year catch-all period.  First,

Berglund maintains his retaliation claim was filed initially in the First Amended Complaint in *Biron*

*and Berglund* on February 4, 2002, and preserved for this case.[4]  Alternatively, Berglund insists the

Oregon Savings Statute, OR. REV. STAT. § 12.020, applies to revive his § 3730(h) claim.  Finally,

Berglund contends Boeing engaged in an ongoing policy of discrimination intended to discourage

---

[4]Berglund first asserted an FCA retaliation claim in this case by filing his Second
Amended Complaint, on May 17, 2004.  Boeing concedes if Berglund is permitted to relate his
retaliation claim filed in May 2004, back to the date of his original Complaint filed in February
2002, "he would not face a substantial time-bar."  (Def.'s Mem. Summ. J. 10.)

him from employment at Boeing and, as such the continuing violation doctrine applies. The court

will consider each of these arguments in turn.

A.    *Consolidation of Cases*

A First Amended Complaint ("FAC") alleging a violation of §3730(h) by Boeing against

Berglund was filed in the *Biron and Berglund* case on February 4, 2002. The Complaint in this case

was filed on February 15, 2002, while the *Biron and Berglund* matter was pending in another court

in this district. *See United States ex rel. Biron and Berglund,* No. 01-163-KI (voluntary dismissal

signed on May 13, 2004 (docket # 40)). As such, Berglund contends he was barred by the

prohibition on claim splitting from pleading a retaliation claim in this case and, consequently, did

not include a §3730(h) claim when the present case was filed. Rather, Berglund included that claim

in this case only after a voluntary dismissal of the *Biron and Berglund* matter. Thus, the court must

resolve the threshold question of which filing date applies to Berglund's § 3730(h) claim here, *i.e.*,

the date the limitations period was tolled for that claim.

The statute of limitations tolls "when the complaint is filed." OR REV. STAT. § 12.020(1);

*Baker v. City of Lakeside*, 343 Or. 70, 72; 164 P.3d 259 (2007). The same applies in an action to

enforce a federally created right. *See Henderson v. United States*, 517 U.S. 654, 657 n.2 (1996);

*Hoffman v. Halden*, 268 F.2d 280, 302 (9th Cir.1959); *rev'd on other grounds*, *Cohen v. Norris*, 300

F.2d 24 (9th Cir. 1962). As stated above, Boeing insists Berglund first filed his retaliation claim in

this case on May 17, 2004, and thus the limitations period is fixed at May 17, 2004. (Def.'s Reply

2.) Conversely, Berglund contends the court should "view the effective date of the retaliation claim

in this matter as February 11, 2002."[5]  (Pl.'s Opp. Summ J. 10.)

The record in *Biron and Berglund*[6] reveals that Berglund first filed a §3730(h) claim against Boeing on February 4, 2002, in the FAC.  *See United States ex rel. Biron and Berglund,* No. 01-163-KI (docket # 16).  Specifically, Berglund alleged:

> 104.    Defendant Boeing has known since shortly after the original complain in this case was filed that a case existed under seal in this Court with the caption "United States ex rel. Biron & Berglund v. The Boeing Company, and Boeing counsel has corresponded with the United State on the premise that the case concerned post-shot peen cleaning of titanium parts.  Boeing thus has actual knowledge that Relator Berglund has taken action protected by the False Claims Act, 31 U.S.C. § 3730(h).

> 105.    Notwithstanding this knowledge, Defendant Boeing has taken several retaliatory actions against Relator Berglund.  These include imposing disciplinary action on him for requiring that titanium parts be processed by Method II cleaning and, in or about October 2001, stripping him of his long-standing job responsibilities and lowering his retention rating.

(First. Am. Compl. ¶¶ 104-105 (*Biron and Berglund*), Feb. 4, 2002.)

On June 4, 2002, Biron and Berglund filed under seal a  Second Amended Complaint ("SAC") after learning some of the parts numbers identified in the FAC were incorrect, and some of the parts identified did not come within the purview of Biron and Berglund's FAC.  Thus, the SAC was filed only to reflect the correct part numbers for those numbers wrongly identified, and to omit the parts that fell outside the allegations of the FAC.  Berglund's claim under § 3730(h) remained unchanged, except the words "without limitation" were inserted in ¶ 105.  (Second Am. Compl.¶¶ 104-105 (*Biron and Berglund*).)  The SAC was never served on defendants, but Boeing

---

[5]Berglund does not explain why February 11, 2002, is the effective date.  His retaliation claim in *Biron and Berglund* was first filed on February 4, 2002, and the present case was initiated on February 15, 2002.

[6]The court notes that the entire record in the *Biron and Berglund* case remains under seal and Boeing has never had an opportunity to review the contents of that file.

received a copy of the SAC on June 10, 2002.  (Keith Decl. Ex. A.)

Berglund contends he did not file the retaliation claim in the present case because of the bar on claim-splitting, *i.e.*, asserting the same claim against Boeing in two different forums.  The prohibition against claim splitting bars subsequent litigation involving the same subject matter.  *See Single Chip Systems Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1058 (S.D. Cal. 2007).  This principle is designed "to protect the defendant from being harassed by repetitive actions based on the same claim."  *Clements v. Airport Auth. of Washoe County*, 69 F.3d 321, 328 (9th Cir. 1995).  As a matter of policy, claim splitting is prohibited "primarily [ ] to conserve judicial resources and to ensure repose for parties who have already responded adequately to the plaintiff's claims."  *Feminist Women's Health Center v. Codispoti*, 63 F.3d 863, 869 (9th Cir. 1995) (quotations and citation omitted.).

Once the government determined it would not intervene in the *qui tam* action filed by *Biron and Berglund*, relators sought to dismiss the entire action, except for Berglund's § 3730(h) claim.  It is clear from the record in *Biron and Berglund* that Berglund intended to preserve his §3730(h) claim and consolidate it with the present case.  Indeed, the motion for voluntary dismissal expressly incorporated an attached declaration from relators' counsel, David J. Hollander.  Hollander stated in his declaration:  "Plaintiffs wish to dismiss this case on the ground that they do not desire to pursue the claims raised in the Complaint *with the exception of the claims for retaliation by Plaintiff Berglund.  Berglund's claims are to be consolidated with another case presently under seal with the court.*"  (David J. Hollander Decl. (Mot. Dismiss) 1-2, May 3, 2004.) (Emphasis added).  Additionally, prior to filing the motion for dismissal, Berglund sought and received an order from this court allowing him to amend his Complaint in this case "to incorporate his retaliation claims in

this action."  (Mem. File Second Am. Compl. 5.)

It is clear Berglund attempted to incorporate or consolidate his timely filed retaliation claim in *Biron and Berglund* into the present *qui tam* action filed against Boeing.  Unfortunately, however, rather than consolidate the retaliation claim in *Biron and Berglund* with this case, the court simply dismissed the entire matter without prejudice.  *See* FED. R. CIV. P 42(a) (court may consolidate "actions involving a common question of law or fact are pending before the court"); *see also Investors Research Co. v. United States District Court*, 877 F.2d 777, 777 (9th Cir. 1989) (district court has broad discretion to consolidate cases pending in the same district).  In so doing, the tolling date for Berglund's retaliation claim shifted from February 4, 2002 (filing of § 3730(h) claim in *Biron and Berglund*), to April 30, 2004 (filing of § 3730(h) claim in the present action).  Although Berglund asks the court to "find that the Second Amended Complaint in this case incorporated the retaliation claim filed in [*Biron and Berglund*]", he cites no authority for the court to create such a novel rule, and the court declines to do so of its own accord.

B.    *Oregon Savings Statute*

Alternatively, Berglund asks this court to apply the Oregon Savings Statute, OR. REV. STAT. § 12.220,[7] to preserve the original filing date of his § 3730(h) claim.  Under certain circumstances, § 12.220 applies to extend the statute of limitations when an action is dismissed.  Subsection (1) provides:

> Notwithstanding ORS 12.020, if an action is filed with a court within the time allowed by statute, and the action is involuntarily dismissed without prejudice on any

---

[7]To the extent civil actions are subject to state statute of limitations, state law governs equitable exceptions that are not inconsistent with federal law.  *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1199 (9th Cir. 1988).  Boeing does not argue the application of the Oregon Savings Clause here is inconsistent with federal law.

ground not adjudicating the merits of the action . . . . the plaintiff may commence a new action based on the same claim or claims against a defendant in the original action if the defendant had actual notice of the filing of the original action not later than 60 days after the action was filed.

OR. REV. STAT. § 12.220(1).  Further, subsection (2) of § 12.220 provides, if § 12.220(1) does apply, a party has 180 days after the judgment in the first action is entered in which to file a new action.  OR. REV. STAT.. § 12.220(2).

Boeing challenges Berglund's reliance on the Oregon Savings Clause and argues the statute is simply inapplicable because Berglund admits he voluntarily dismissed the Complaint in *Biron and Berglund.  See Pulido v. United Parcel Serv. Gen Serv. Co.*, 31 F. Supp. 2d 809, 816 (D. Or. 1998). The court disagrees.  Biron and Berglund's counsel *voluntarily* dismissed the *qui tam* action and Biron's claims for retaliation.  However, he expressly exempted Berglund's retaliation claim from a voluntary dismissal.  The fact the claim was ultimately dismissed without prejudice does not alter Berglund's clearly stated intent to preserve prosecution of that claim and, thus, dismissal of Berglund's § 3730(h) should be viewed as *involuntary*.  As such, the Oregon Savings Statute should apply to fix the filing date of Berglund's § 3730(h) claim.  Moreover, Berglund filed a new action based on the same claim against Boeing, a defendant in the original action, within the 180 days required by §§ 12.220(2).[8]

In sum, pursuant to the Oregon Savings Clause, Berglund tolled the limitations period for his § 3730(h) claim with the filing of the FAC in *Biron and Berglund* on February 4, 2002.  Boeing admits that every alleged incidence of retaliation occurred in April 2001 and later.  (Def's. Reply

---

[8]Pursuant to the FCA, Berglund was not required to serve Boeing until the court so ordered.  *See* 31 U.S.C. § 3730(b)(2).  As such, Berglund is excused from providing Boeing actual notice within 60 days of filing the *Biron and Berglund* FAC.  *See* OR. REV. STAT. § 12.220(1).

26 – OPINION AND ORDER

4.)  Boeing concedes if the date of the retaliation claim does relate back to early 2002, Berglund "would not face a substantial time-bar."  (Def.'s Mem. Summ. J. 10.)  Finally, the court notes Boeing received actual notice of Berglund's retaliation claim by at least June 2002.  Nor does Boeing allege it will suffer prejudice if that claim survives a statute of limitations challenge.  Although allegations have been added over the years, Berglund's claim against Boeing is unchanged; namely, Boeing retaliated against him after learning of the *qui tam* action in February 2001.  Further, under any reading of the applicable limitations period, Boeing must still defend charges it retaliated against Berglund for engaging in protected activity.

C.      *Continuing Violation Doctrine*

Alternatively, Berglund contends all of the allegations of his retaliation claim are timely under the continuing violation doctrine.  Specifically, Berglund argues Boeing "engaged in a series of acts to accomplish a specific retaliatory goal – separating [] Berglund from their employ."  (Pl.'s Opp. Summ. J. 17.)  Further, Berglund maintains Boeing "engaged in a patient but concerted effort that culminated in his layoff in September 2003."  (Pl.'s Opp. Summ. J. 17.)  As such, Berglund relies on the continuing violation doctrine to argue his claim is timely.  *See Gutowsky v. County of Placer*, 108 F.3d 256, 259-60 (9th Cir. 1997).

Under certain circumstances, the continuing violation doctrine permits an employee to file suit based upon events occurring outside the applicable limitations period.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (discussing the continuing violation doctrine for Title VII claims).  Prior to the Supreme Court's 2002 decision in *Morgan*, plaintiffs could invoke the continuing violation doctrine by showing a series of related acts, one or more of which fell within the limitations period, or a systemic policy or practice of discrimination before and during the

limitations period.  *See Gutowsky*, 108 F.3d at 259.  However, in *Morgan*, the Supreme Court invalidated the related acts method of showing a continuing violation under Title VII, reasoning that discrete discriminatory acts are not actionable if time-barred, even if they are related to acts alleged in timely filed charges. 536 U.S. at 113.  The Court held that "each discrete discriminatory act starts a new clock for filing charges alleging that act" so that discriminatory "termination, failure to promote, denial of transfer, or refusal to hire" are examples of actions that constitute "discrete discriminatory acts" and therefore are not subject to the continuing violation doctrine. *Id*. at 113-14. In contrast, the Court found a hostile work environment would support the application of the continuing violation doctrine because such a claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id*. at 117.

Berglund does not point to any case in which a court has determined the continuing violation doctrine is applicable to FCA retaliation claims, nor was this court able to find any controlling authority that has addressed this issue.  *But see Pakter v. New York City Dep't of Educ.*, No. 08-7673, 2010 WL 1141128, at *6 (S.D.N.Y. Mar. 22, 2010) (court considers whether the continuing violation doctrine spares plaintiff's otherwise time barred FCA claims, but determines it does not). Regardless, the court need not reach the issue of whether Berglund's allegations are timely under the continuing violation doctrine because of its ruling above (section II.B) that the Oregon Savings Clause applies to Berglund's retaliation claim.  Finally, even assuming that doctrine does not apply to the circumstances here, the law is clear that Berglund may capture events outside the limitations period as evidence to prove timely his timely retaliatory lay-off claim. *See Morgan*, 536 U.S. at 113

("[T]he statute [does not] bar an employee from using the prior acts as background evidence in

support of a timely claim.")

At oral argument, it was clear Berglund's claim for retaliation against Boeing is grounded primarily in two discretionary decisions by Boeing that positioned Berglund for a mandatory, *i.e.*, non-discretionary, lay-off under the relevant collective bargaining agreement ("CBA"). The first of two discretionary employment actions taken by Boeing against Berglund was a downgrade in Berglund's job classification. Specifically, in March 2002, Boeing informed Berglund his Level 4 Manufacturing Engineer/Planner position was being eliminated and he could either choose to be downgraded to a Level 3 Manufacturing Engineer/Planner or be laid off. Berglund accepted the downgrade from a Level 4 to a Level 3 Engineer. Boeing transferred the responsibilities of Level 4 Manufacturing Engineer/Planners to a new job classification titled "Level 4 Product Manager." Two of Berglund's peers, Toby Tyler and Dave Sasseen, were transferred from their positions of Level 4 Manufacturing Engineer/Planner to the new classification of Level 4 Product Manager. Additionally, two other Boeing employees, Chris Carpenter, a Level 3 Manufacturing Engineer/Planner and, Rich Kummerle, a Level 4 Tool Designer, were promoted to the newly created Level 4 Product Manager. (Carpenter was upgraded from a Level 3 to a Level 4 in the process.) This down grade in Berglund's job classification occurred in March 2002, approximately one month beyond the two-year limitations period for Berglund's § 3730(h) claim.

The second discretionary action taken by Boeing was a downgrade in Berglund's retention rating from R2 to R3, based on an unprecedented annual review by Hanna in December of 2002. As set forth above, in August 2002, Hanna became Berglund's manager. Berglund admits he received a "scathing review" from Hanna at the end of 2002, but charges Hanna's review was not constructive and was a personal attack intended to lower Berglund's morale and encourage him to

quit his position at Boeing.  Further, Berglund claims Hanna's 2002 review was not in Boeing's usual format, which would allow him an opportunity to address the criticisms and provide his thoughts and feedback  Berglund claims neither Hanna nor any previous supervisor ever counseled or disciplined him for the type of behavior set out in the "Customer Comments re:  Cliff Berglund Performance" document.  Following the November 2002 review by Hanna, Berglund's retention rating was downgraded from an R2 to and R3.  (Berglund Decl. ¶¶ 35-38; Hanna Decl. Ex. C.)

On July 19, 2003, Boeing issued Berglund a WARN advance notice of termination effective September 19, 2003.  (Berglund Dec. ¶ 40.)  The parties agree that once a retention rating is assigned, the lay-off procedures are government by the CBA and are "mechanical" in nature.  Nor is there any evidence in the record the implementation of the CBA lay-offs was wrongful.  Rather, Berglund insists that the discretionary act of lowering his job classification placed him in a job vulnerable to lay-off, combined with a second discretionary act of dropping his retention rating from R2 to R3, made a lay-off under the CBA inevitable.  Thus the job classification, the retention rating, and the lay-off purportedly combined to serve Boeing's purpose of terminating Berglund's employment.  Berglund is permitted to rely upon these allegations to establish Boeing's lay-off decision in September 2003, a timely discriminatory act, was in retaliation for Berglund filing the *qui tam* action.

III.    Berglund's Claim Under 31 U.S.C. § 3730(h)

Berglund brings his retaliation claims under 31 U.S.C. § 3730(h), the FCA's whistleblower provision.  This provision allows employees to recover if they have been "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment . . . because of" their lawful acts done in furtherance of efforts to stop

false claims on the government. 31 U.S.C. § 3730(h). An FCA retaliation claim requires proof of three elements: "1) the employee must have been engaging in conduct protected under the Act; 2) the employer must have known [] the employee was engaging in such conduct; and 3) the employer must have discriminated against the employee because of [his] protected conduct." *Hopper*, 91 F.3d at 1269; *see also Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1103 (9th.Cir. 2008); *Spencer v. Lake Oswego Little League*, No. 09-1024-MO, 2009 WL 4729939, *1 (Dec. 2, 2009).

The Ninth Circuit has not expressly determined whether the burden-shifting analysis utilized by the courts in analyzing claims under Title VII of the Civil Rights Act also applies to whistleblowing claims under the FCA. However, every court to address this issue directly has concluded an affirmative defense is available to the employer. *See, e.g., Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005), *abrogated on other grounds by Fox v. Vice*, ___ U.S. ___, 131 S. Ct. 2205 (2011); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 235 (1st Cir. 2004); *Dookeran v. Mercy Hospital of Pittsburgh*, 281 F.3d 105, 107 (3rd Cir. 2002); *Norbeck v. Basin Elec. Power Co-op.*, 215 F.3d 848, 850-51 (8th Cir. 2000); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 n. 4 (D.C. Cir.1998). *See also Moore v. Cal Inst of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 847-48 (9th Cir. 2002) (conduct does not constitute "retaliation" under the FCA unless it would be sufficient to constitute an adverse employment action under Title VII). Moreover, the legislative history clearly indicates Congress intended an inquiry similar to other whistle blower statutes. The Senate Report for the False Claims Amendments Act of 1986 states, in part:

> Section [3730(h) ] provides relief only if the whistleblower can show by a preponderance of the evidence that the employer's retaliatory action resulted 'because' of the whistleblower's participation in a protected activity. Under other

Federal whistleblower statutes, the 'because' standard has developed into a two-pronged approach. One, the whistleblower must show the employer had knowledge the employee engaged in 'protected activity' and two, the retaliation was motivated, at least in part, by the employee's engaging in protected activity. Once these elements have been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity.

S. Rep. No. 99-345, at 35, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300.

Thus, the court will apply the Title VII burden-shifting methodology to evaluate Berglund's claims here. Accordingly, if Berglund establishes a *prima facie* case for retaliation under the FCA, the burden of production shifts to Boeing to articulate a legitimate, non-retaliatory explanation for the adverse employment action. *See, e.g., Dawson v. Entek Intern*, 630 F.3d 928, 936 (9th Cir. 2011). If Boeing successfully rebuts the inference of retaliation, the burden of production shifts back to Berglund to show Boeing's proffered explanation is merely a pretext for impermissible retaliation. *Id*.

Boeing insists Berglund's case is "fatally flawed." According to Boeing, Berglund has failed to establish Boeing took action against him because of his FCA activities. Next, Boeing maintains there is ample evidence Berglund's lay-off and the earlier decision to lower his retention rating would have occurred in any event, and there is no evidence to indicate Boeing's proffered reasons are pretext.

A.      *Berglund's Prima Facie Showing*

There can be no dispute Berglund was engaging in conduct protected under the Act when he filed the *qui tam* actions against Boeing alleging Boeing knowingly violated 31 U.S.C. § 3729. *See, e.g., Yesudian*, 153 F.3d at 739 ("protected conduct element of such a [3730(h)] claim does not require the plaintiff to have developed a winning *qui tam* action before he is retaliated against"); 31

U.S.C. § 3730(h) (plaintiff must have engaged in "acts . . . in furtherance of an action under this section"). Additionally, there is ample evidence in the record that Boeing knew Berglund was engaging in protected conduct under the FCA as early as February 2001. (Berglund Decl. ¶¶ 7-8; Payette Decl. ¶¶ 2-4.) Thus the remaining *prima facie* inquiry is whether Berglund has presented competent evidence Boeing discriminated against him because of his whistleblowing.

As discussed above, Berglund relies primarily on a series of three events to show retaliation:

❏    On or about March 6, 2002, Berglund was informed his job title of Level 4 Manufacturing Engineer/Planner was to be eliminated and he had the choice of a downgrade to a Level 3 Manufacturing/Engineer Planner or termination, to which Berglund chose the down grade. (Berglund Decl.¶ 27.)

❏    At the time of Berglund's downgrade to Level 3, there were two other individuals at Boeing Portland with the classification of Level 4 Manufacturing/Engineer Planner, Dave Sasseen and Toby Tyler. Berglund alleges neither Sasseen nor Tyler were downgraded to a Level 3 Manufacturing/Engineer Planner and, rather, both retained their Grade Level 4 and were given positions in a newly created job classification of Product Manager. (Berglund Decl.¶ 28.)

❏    Berglund alleges he asked his managers whether there was any more Level 4 work in Portland and was told "yes," but it was to be performed by individuals with the "Product Manager" classification. (Berglund Decl. ¶ 27.)

❏    Berglund alleges his complaints to Susan Miller in Boeing Portland Human Resources have gone unanswered. (Berglund Decl. ¶¶ 30-32.)

❏    In August 2002, Hanna became Berglund's manager. Berglund admits he received a "scathing review" from Hanna at the end of 2002. Berglund charges, however, that Hanna's review was not constructive and was a personal attack intended to lower Berglund's morale and encourage him to quit his position at Boeing. Further, Berglund claims Hanna's 2002 review was not in Boeing's usual format, which would allow him an opportunity to address the criticisms and provide his thoughts and feedback  Additionally, Berglund claims neither Hanna nor any previous supervisor ever counseled or disciplined him for the type of behavior set out in the "Customer Comments re:  Cliff Berglund Performance" document. Following the November 2002 review by Hanna, Berglund's retention rating was downgraded from an R2 to and R3, which was raised to an R2 based on Berglund's seniority. (Berglund Decl. ¶¶ 35-38; Hanna Decl. Ex. C.)

❑    Berglund remained in that position until July 19, 2003, when Boeing issued a Workers Adjustment and Retraining Notification ("WARN") advance notice of termination effective September 19, 2003. (Berglund Decl. ¶ 40.)

B.    *Boeing's Legitimate Non-Retaliatory Explanation*

Boeing insists Berglund's claims of retaliation are meritless. Specifically, Boeing challenges each of the factual assertions Berglund relies upon for an inference that Boeing engaged in unlawful retaliation.

1. Berglund was Treated Differently after the FCA Claim was Filed.

Boeing counters that Berglund received corrective action reports in May and June 1999, and Berglund admits those reports were not in retaliation. Similarly, Berglund received a corrective action in March 2003, after filing suit, for sloppy work. Berglund admitted in his deposition that he had erred and thus the corrective action was valid and non-retaliatory. Moreover, even the reviews Berglund submits with his second declaration show he was cited for poor personal skills and insubordination prior to filing suit.

Boeing agrees, however, Hanna performed reviews differently from Berglund's previous supervisors, but argues it was his prerogative as a manager. Further, Boeing asserts Hanna performed the same type of review for all those reporting to him in 2002; namely, he solicited the views of all his employee's customers, combined them with his own views, and created a final review for each employee. Thus, rather than being singled out for such a review, Berglund was treated like everyone else.

2. Berglund was Treated Differently and Worse than Similarly Situated Employees.

Boeing explains even Berglund admits that following the post-9/11 downturn in the aviation industry, all employees in Berglund's position and with his retention rating were laid off. Further,

Boeing contends Berglund must show he and his coworkers "were similarly situated in all relevant respects and yet []he received a more severe punishment for committing substantially the same offense." *Russell v. TG Missouri Corp.*, 340 F.3d 735, 745 (8th Cir. 2003). According to Boeing, Berglund cannot make such a showing. Of the four employees who, in March 2002, were assigned to a new position during a redeployment of work due to the poor economy – Toby Tyler, Dave Sasseen, and Chris Carpenter – were manufacturing planners like Berglund. However, none of those three received poor reviews, and all were designated R1's, the highest rating possible. The fourth, Rick Kummerle, was an operation program analyst, an entirely different position than Berglund's. Boeing explains that because those four were not similarly situated with Berglund, Boeing's treatment of them is not evidence of pretext.

In fact, Boeing contends Berglund was treated similarly to other similarly situated employees during his 2002 performance review. For example, Bruce Allison, like Berglund, reported directly to Hanna in 2002, and also received a host of negative comments from his customers during the review. Allison, like Berglund, was a Level 3 Manufacturing Planner, and also received an R3 retention rating after his review. Similarly, Allison was laid off in September 2003.

### 3.   Five Boeing Employees Dispute Berglund's 2002 Performance Review

Berglund submits declarations from five other Boeing employees who disagree with parts of his 2002 review. Boeing opposes Berglund's reliance on those declarations because Berglund failed to properly disclose the declarants. Boeing charges Berglund submitted his initial disclosures on August 28, 2007, and never supplemented them. His disclosures did not include Evelyn Lenzi, Barry Jenkins, Steph Vassale, or Cathy Rolesk. Rather, only Larry Payette was disclosed, and even

then he was only listed as having "knowledge that Boeing learned of the filing of a Qui Tam action prior to its authorized release by the Court," not that he had evidence of Boeing's alleged retaliation.

According to Boeing, Berglund provides no justification at all for failing to disclose the four witnesses, and by disclosing the witnesses after the discovery cutoff. Boeing insists Berglund has impeded Boeing's ability to respond and requests Berglund not be permitted to rely on those four declarants to support his response.

Nevertheless, even if the declarations are considered, Boeing argues that evidence cannot overcome the admitted fact of numerous honest, non-retaliatory criticisms of Berglund by his internal customers to support the negative performance review. Moreover, Boeing charges it is immaterial whether Berglund can find a handful of employees who liked him.

### 4. Berglund's Supervisors were Following Him and Treating Him Unfairly

Boeing accuses Berglund of making unsubstantiated accusations that he was followed by Boeing and was unfairly criticized. Berglund received a corrective action memo in April 2001, that he claims falsely accused him of failing to include a warning about the effects of etching on titanium parts. In support of his claim that the correction action memo was retaliatory, Berglund offers only that he "felt as though Boeing was trying to make me the scapegoat of its own noncompliance." (Berglund Decl. ¶ 9.) Berglund also cites three confrontations with managers in 2001 in which he "felt personally attacked." (Berglund Decl. ¶ 10.) He claims to have received "several threatening calls from" his supervisor related to his taking sick and vacation time. (Berglund Decl. ¶ 16.) Berglund believes he was asked to move work stations after knee surgery as punishment for his lawsuits. (Berglund ¶ 18.) Berglund claims that a "short time after this lawsuit was filed" he "often saw [his] supervisors and Boeing Security following [him] as far the limits of Boeing property."

(Berglund Decl. ¶ 6.)  He was written up by a new supervisor, Scott Simmons, for failing to adhere to his shift start time. (Berglund Decl. ¶ 33.)  Berglund recounts an incident in September 2001 where a supervisor demanded he sign a time record he believed was inaccurate.  (Berglund Decl. ¶ 11.)  Berglund suggests all of the above instances were in retaliation for his FCA activities, but Boeing insists the allegations are legally insufficient to survive summary judgment.[9]

C.    *Evidence of Pretext*

Berglund argues Boeing's decision to place him in a job classification that was vulnerable to lay-off, coupled with Hanna's unprecedented review procedures resulting in a lowering of his retention rating, along with the timing of Boeing's actions and its knowledge of his *qui tam* action, is sufficient to establish pretext and survive summary judgment.  While Berglund acknowledges he was not a perfect employee prior to filing the Complaint in *Biron and Berglund*, he had never received the type of review issued by Hanna in 2002, *i.e.*, that review differed in its nature and character.

Berglund charges that Hanna's 2002 review of him was a significant departure from past practices in evaluating employees and is evidence of pretext.  Berglund has presented some evidence in support of this contention.  In the past, Berglund's performance reviews would follow a standard format, *i.e.*, Berglund provided a description of his work assignment; his supervisor provided comments regarding his work performance; both Berglund and his supervisor had the opportunity to comment on the performance review; and  both Berglund and his supervisor signed and dated his review. (Second Berglund Decl. Ex. 1-16.)  In contrast, Berglund asserts "Hanna embarked on a

---

[9]Boeing also contends these allegations are time barred.  As stated above (sections II.B. II.C.), Berglund may rely on these allegations to show the September 2003 lay-off was retaliatory.

campaign to solicit only negative comments regarding [] Berglund's performance from his co-workers." (Mem. Opp. Summ. J. 25.)  Berglund also maintains Hanna took affirmative action to find criticism, and people who knew Berglund were not approached.  Boeing refused to tell Berglund who made the negative comments, (Berglund Dep. 926:12-927:12), and in a departure from prior reviews, Berglund was not offered the opportunity to describe his job duties, comment on his performance, or sign off on the evaluation.

Hanna admits knowing of the present case at the time he performed the review.  Berglund charges Hanna had to be aware his selection of Berglund's retention rating would directly impact whether Berglund would be terminated during the next round of lay-off made pursuant to the terms of the CBA.  As such, Hanna used only selective and biased comments to include in Berglund's review titled, "2002 Retention Conversation," in which Berglund was informed that based on "customer comments" and Hanna's comments,  Berglund's retention rating was lowered to an R3.

There is no dispute that Boeing, and Hanna were aware of the Berglund's lawsuit.  In addition, there were two unprecedented and discretionary actions taken by Boeing that led directly to Berglund being selected for lay-off under the CBA.  First, as set forth above, in March 2002, Boeing informed Berglund his Level 4 Manufacturing Engineer/Planner position was being eliminated and he could either choose to be downgraded to a Level 3 Manufacturing Engineer/Planner or be laid off.  Berglund accepted the downgrade from a Level 4 to a Level 3 Engineer.  Boeing transferred the responsibilities of Level 4 Manufacturing Engineer/Planners to a new job classification titled "Level 4 Product Manager."  Two of Berglund's peers, Tyler and Sasseen, were transferred from their positions of Level 4 Manufacturing Engineer/Planner to the new classification of Level 4 Product Manager.  Additionally, two other Boeing employees,

Carpenter, a Level 3 Manufacturing Engineer/Planner and, Kummerle, a Level 4 Tool Designer, were promoted to the newly created Level 4 Product Manager. (Carpenter was upgraded from a Level 3 to a Level 4 in the process.) There is evidence in the record that Berglund's inquires into why his job classification was lowered went unanswered. Next, Hanna conducted a discretionary review of Berglund that even Boeing acknowledges was a more complete evaluation and a break from past practices. The poor review by Hanna resulted in the drop in Berglund's retention rating to R3 and, ultimately, mandated a forced lay-off.

While there is evidence Berglund received both good and below average reviews over the years and his retention rating fluctuated between a R1 and R3, Boeing kept him through all those years. It is only after Berglund filed a *qui tam* action that circumstances collided and resulted in his mandatory lay-off under the CBA. The court finds Berglund has come forth with sufficient evidence of pretext to survive summary judgment on his claim for retaliation under § 3730(h). It is for a jury to decide whether Berglund's lay-off resulted from legitimate considerations and the timing was a coincidence or whether it was retaliation under § 3730(h).

IV.    Motion for Sanctions

Boeing moves for sanctions against Berglund on the grounds he "has engaged in a long-running campaign to alter, conceal, and destroy evidence, and has given false testimony under oath." (Mot. Sanctions 2.) Specifically, Boeing charges Berglund altered the text of certain email messages he produced to Boeing and the United States and deleted other email messages. Boeing charges Berglund never informed Boeing or the government he had altered some email messages and deleted others, and Boeing was left to discover those misdeeds on its own. Boeing further charges that Berglund also discarded three hard drives from his home computer years after he filed this case,

39 – OPINION AND ORDER

despite the likelihood those hard drives contained discoverable and relevant evidence.  In fact, it appears Berglund discarded one of the hard drives despite a court order requiring him to produce it.  Finally, Boeing accuses Berglund of lying about his misconduct in sworn testimony.  Boeing urges the court to exercise its authority under FED. R. CIV. P. 37 and the court's inherent authority to sanction Berglund's abusive litigation practices.

Berglund opposes Boeing's sanctions motion.  He argues it is untimely, that it relies on inadmissable evidence, and that Boeing has failed to show prejudice.  However, Berglund does not deny the misconduct Boeing describes in its motion.  For the reasons detailed below, the court grants Boeing's motion, orders Berglund to pay monetary sanctions to Boeing, and dismisses Count Two of Berglund's TAC.

A.    *Alleged Misconduct*

1.  Altered Emails

Boeing charges Berglund altered email messages and lied about doing so while under oath at deposition.  During discovery, Berglund produced hundreds of pages of email messages to Boeing he claimed were the same email messages provided to the government during its false claims investigation.  (Calvin L. Keith Decl. Supp. Mot. for Sanctions ("Keith Sanctions Decl.") ¶ 2, Ex. A at 3, Feb. 4, 2011.)  Among these emails are Berglund's exchanges with co-workers in late 2001 and early 2002, immediately before Berglund filed this case in February 2002, in which they discuss at length Boeing's compliance with internal manufacturing specification BAC 5008.  Boeing

represents that it compared Berglund's email messages to those produced by Boeing employees and found certain key emails key appeared repeatedly but differed in content.

40 – OPINION AND ORDER

The record proves Boeing's charge.  One example is an email string that occurred between November 26, 2001, and December 6, 2001.  The version of that string Boeing produced during discovery is Exhibit B to the Keith Sanctions Declaration, and the version of that string Berglund produced during discovery is Exhibit C to the Keith Sanctions Declaration.  A comparison of the two strings reveals that although both versions bear the same Microsoft Outlook header, the content of the two versions differs significantly.  For example, on November 26, 2001, a Boeing engineer named Eunkyong ("Kris") Lim sent an email to several people in which she suggested manufacturing plans prepared by Berglund did not comply with BAC 5008.  Berglund responded to Lim's email the same day Lim sent it.  The version of Berglund's response that Boeing produced includes this sentence:

> [H]owever, as a result of demonstrated process results and data collected and submitted to [Boeing Materials Technology] which showed no burns over a specified period, BAC 5008 was revised to allow the use of "Castrol Syntilo 9913 coolant" and the nital etch inspection operations were removed.

(Keith Sanctions Decl. Ex. B at 3.)  The last sentence of the version Boeing produced ends with this sentence:

> However, "all" of these surfaces have "<u>additional material removed</u>" outside of the HMC cell to achieve finish dimensional surface requirements . . . .  This removal of material excess meets the engineering spec requirements of BAC 5008 & BAC 5436 which negates the requirement to nital etch inspect these surfaces as you have requested.

(Keith Sanctions Decl. Ex. B at 3 (emphasis in original).)


Berglund's version of the same message in that email string is different in several material respects.  First, the entire first sentence above is replaced with "In Nov. 1998, the nital etch inspection operations were removed."  (Keith Sanctions Decl. Ex. C at 3.)  Second, the rest of the

41 – OPINION AND ORDER

sentence was has been deleted.  Third, the last sentence of Berglund's version reads:

> However, 'only the holes' of these surfaces, have 'additional material removed' outside of the HMC cell to achieve finish dimensional surface requirements.

(Keith Sanctions Decl. Ex. C at 4 (emphasis in original).)  The critical language in the original passage – Berglund's statement that the "removal of material excess meets the engineering spec requirements of BAC 5008 & BAC 5436" – is missing.  The effect of Berglund's changes to the original version of this message is to convert his original opinion that Boeing is complying with BAC 5008 into the contrary view that Boeing is failing to comply with BAC 5008 – a view which, if Berglund actually had voiced it in November of 2001, supports Berglund's retaliation claim because it would be evidence that he reported Boeing's noncompliance in 2001.

Another example appears later in the same email string.  On November 28, 2001, Berglund wrote to Melvin Nilsen, a Boeing engineer, seeking assistance in responding to Lim's concerns.  In Boeing's produced version of that message, Berglund's message ends:

> I feel that we are in spec and ENGR [drawing] *compliance* with the current processing which has been in place since your approval of this coolant in 1998. . . . It would be a costly endeavor to change processing of these parts at this time.

(Keith Sanctions Decl. Ex. B at 2 (emphasis added)).  In Berglund's version of that same message, the last sentence reads:

> I feel that we are in spec and ENGR [drawing] *conflict* with the current processing which has been in place since your approval of this coolant in 1998. *The flag notes in BAC 5008 after further review seem to clearly state that nital etch is required for all surfaces when the wy4 coolant is used . . . . let me know what you think.*

(Keith Sanctions Decl. Ex. C at 2 (emphasis added).)

Once again, the original version of a contemporaneous email message contradicts Berglund's retaliation claim. Berglund had opined at the time of the events in question that Boeing was within specification and had achieved engineering "compliance." However, Berglund's version of that same email exchange contains Berglund's "opinion" that Boeing's engineering drawings conflict with the required specification, and omits Berglund's contemporaneously expressed concerns about the costs to change the processing of the parts at issue. Also again, the changes in Berglund's version convert his contemporaneous statements and opinions supporting the processing of the parts at issue into a warning that Boeing is disregarding required specifications. The effect of Berglund's alteration of the email string is to give support to his retaliation claim.

Boeing points out that only a side-by-side comparison of similar email strings revealed these inconsistencies; there are no notes or annotations identifying or explaining them. (Def.'s Mem. Sanctions 4.) Boeing thus explored the unexplained discrepancies with Berglund at his January 2010 deposition. Specifically, Boeing's counsel showed Berglund the second version of the Lim-Berglund-Nilsen string that supported claims for fraud and retaliation. (Keith Sanctions Decl. Ex. D at 75 (hereinafter "Berglund Dep.").) Boeing's counsel specifically asked Berglund whether that version of the Lim-Berglund-Nilsen string was the "true and correct copy" of the string. After taking time to review the email string, Berglund responded "[y]es, it is." (Berglund Dep. 75:7-75:18, Jan.

43 – OPINION AND ORDER

26, 2010.)  Boeing's counsel then confronted Berglund with the original version of the same string;

Berglund acknowledged the original version contradicted his fraud and retaliation claims, and he

admitted he had "changed" some language and "deleted" other language in the original version to

support his claims.  (Berglund Dep. 80:7-90:15.)   Berglund attempted to explain his various

alterations to the email string:

> What these two [versions of the same email string] that you've placed here before
> me represent is a string of e-mails that I sent back and forth between myself, Kris
> Lim, members of [Boeing Materials Technology, like Mr. Nilsen], and – look and
> see if there was anyone else here – where the facts of the use of WY4 coolant were
> in question is, for a period of time we were in compliance and/or not in compliance.
> And as I forwarded these emails, when you take and press the forward button in
> exchange, you have the opportunity to take and edit and so change.   And as
> information became available to me that contradicted what I had previously written,
> these were changed to take and reflect what I knew to be the best and correct
> information at the time and most accurate.

(Berglund Dep. 81:21-82:8; *see also* 92:19-92:22 ("I used that practice . . . when I was doing

investigations to take and reflect the – the most accurate, you know, information at the time as I

knew it when I forwarded to – to new recipients.").)

     During his deposition, Berglund admitted he altered several other email messages.

(Berglund Dep.121:9-123:10, 468:25-471:21, 476:1-483:7.)   He insisted he made all of these

alterations no later than December 2001, and that he had informed the government about his

"editing" of email messages.  (Berglund Dep. 93:1-4 ("Q:  Did you tell the government that you

changed these emails?  A:  Yes, I believe at some point in time that was conveyed to them.").)

However, seven months later, in August 2010, Berglund contradicted his deposition testimony in

his answers to Boeing's interrogatories by admitting he did not tell the government he altered email

messages and did not  inform Boeing he altered email messages.  (Keith Sanctions Decl. Ex. A at

3.)

44 – OPINION AND ORDER

The record also demonstrates Berglund lied when he represented he made all of his email alterations at or near the time the messages were written and prior to any litigation. In January 2002, Berglund made his decision to file this lawsuit (Berglund Dep. 55:23-58:9), and he filed his initial complaint the next month, on February 15, 2002. According to a forensic investigation of Berglund's work computer, however, Berglund altered the Lim-Berglund-Nilsen string discussed above on at least two occasions *after* January 2002. (Del Valerio Decl. ¶¶ 6(a)-(n).) The same forensic investigation also established Berglund altered a July 7, 1998, message written by Christer Hellstrand years after Hellstrand wrote the message. (Valerio Decl. ¶¶ 6(o)-(u).)

### 2. Deleted Emails

Next, Boeing charges Berglund "deleted hundreds of messages stored on his work computer." (Def.'s Mem. Sanctions 7.) Based upon a forensics investigation, Boeing maintains Berglund deleted 141 messages between January 2002 and February 15, 2002, and an additional 261 messages after he filed this suit. (Valerio Decl. ¶ 4.) Some of the emails deleted after January 2002, relate to Berglund's claims against Boeing and contradict his allegations of non-compliance. (Valerio Decl. ¶ 5.) For example, in one of the deleted messages Boeing recovered, Berglund informs his supervisor, Albert Morgan, that "our process is in compliance with BAC 5440, BAC 5008 & BAC 5436." (Valerio Decl. Ex. A at 1.) Berglund never informed Boeing he deleted emails from his work computer after he decided to sue Boeing and filed this suit. Rather, Boeing discovered the deletions only after a forensic investigation of Berglund's work computer. (Valerio Decl. ¶¶ 3-5.)

### 3. Discarded Hard Drives Pre-January 2010

During his January 2010 deposition, Berglund admitted he discarded two hard drives from

his home computer, purportedly because they malfunctioned.  (Berglund Dep. 958:21-959:11

("Unfortunately, we've lost that hard drive twice[.]  It's been replaced twice.").)  Berglund never

explained why the two hard drives failed or when they failed, other than to say both failures

occurred after February 2007, and the second failure occurred "midyear 2008 to the best of my

memory." (Keith Decl. Ex. A at 3.)  Berglund has not suggested he made any effort to recover data

from the hard drives after they failed, nor does it appear he attempted to preserve the hard drives for

Boeing's inspection.

Boeing claims "[t]here is no doubt that [Berglund] destroyed relevant and discoverable

evidence by discarding those two hard drives."  (Def.'s Mem. Sanctions 7.)  As evidence of this,

Boeing points out Berglund used his home computer both to search for jobs and do some work for

his wife's business after he was laid off in 2003, and prior to being rehired by Boeing in 2004.

Berglund testified he saved documents related to those activities on his home computer.  (Berglund

Dep. 958:21-961:18.)  According to Boeing, it intended to use such documents to show Berglund

failed to mitigate damages arising from Boeing's alleged retaliation; thus, Boeing expressly

requested that category of documents during discovery.  (Keith Decl. Ex. E at 9-10 (seeking "[a]ll

documents that refer or relate to your search for employment between the time your furlough by

Boeing began in September 2003 to the time you were rehired by Boeing in September 2004," as

well as all documents related to Berglund's employment during that time).)

Further, there is some evidence the pre-2010 hard drives contained other relevant

information.  An unsolicited third party provided to Boeing an email message sent to them from

Berglund on January 7, 2008.  In the email message Berglund calls Boeing "stupid" for rehiring him

in 2004, and claims the only remaining issues in this case are whether he will remain with Boeing

after a settlement, and whether that settlement will be "7 figures or 8 figures".  (Keith Decl. Ex. F.)

Berglund never produced this email in response to Boeing's discovery requests.  (Keith Decl. Ex.

E at 8 (seeking "[a]ll documents that refer or relate to your communications with any person or

entity, other than the U.S. Government, referring or relating to any matter alleged in the Complaint

or this lawsuit"); Ex. E at 7 (seeking "[a]ll documents that you prepared, including diaries,

calendars, 'daytimers,' planners, date books, logs, drafts, memoranda and notes, that refer or relate

to any matter alleged in the Complaint or this lawsuit").)

Boeing confronted Berglund with the January 7, 2008, email message at his deposition.

Berglund testified he did not recall the document and he did not know whether it existed on his

home computer.  (Berglund Dep. 183:11-15, 189:2-12, 189:25-191:3.)  In yet another turn-about of

his sworn testimony, Berglund subsequently admitted he wrote the email (Keith Sanctions Decl. Ex.

G at 3.)  Boeing asserts Berglund likely sent the January 7, 2008, email from his home computer.

(Valerio Decl. ¶ 7 (explaining the message does not exist on Berglund's work computer).)

### 4.  Discarded Hard Drive Post-January 2010

After learning Berglund had discarded two hard drives from his home computer, Boeing

asked Berglund to search for, preserve, and produce all discoverable information on his home

computer.  (Berglund Dep. 189:25-191:6, 688:4-690:8, 958:21-959:13; Keith Sanctions Decl.

G at 2.)  On March 5, 2010, Boeing served Berglund with a request to inspect his home computer

pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure.  (Keith Decl. Ex. H.)  The

following day, after a phone hearing with counsel which focused on Boeing's efforts to obtain

inspection of Berglund's personal computers, this court specifically ordered Berglund to allow

Boeing to inspect his home computer.  *See Berglund v. Boeing*, 02-193-AC (D. Or. March 11, 2010)

(Docket # 167, Order) ("inspection of the personal computer or computers belonging to or in the possession, custody, or control of, plaintiff"). On April 5, 2010, Berglund's counsel informed Boeing that a third hard drive belonging to Berglund had crashed. (Steve Y. Koh Decl. ¶ 2, Feb. 4, 2011.) Two days later, Berglund's counsel informed Boeing, via email, that the third hard drive had been "trashed, literally." (Koh Decl. Ex. A.)

The sequence of these event establishes beyond dispute that Berglund discarded the third hard drive after this court ordered him to allow Boeing to inspect it. Berglund did not alert either Boeing, following its March 5, 2010, request for inspection, or the court, following its March 11, 2010, inspection order, to a problem with the third had drive. Nor did Berglund's counsel mention any problems with the hard drive during the March 11, 2010, telephone conference with the court, which, again, was substantially devoted to Boeing's request to inspect Berglund's personal computer. (Koh Decl. ¶ 4.) Finally, when Boeing inquired about the circumstances surrounding the third hard drive crash, Berglund did not suggest he had discarded it before March 11, 2010. Rather, he admitted only that the third drive crashed in February 2010. (Keith Sanctions Decl. Ex. A at 3-4.) Boeing concludes this evidence suggests Berglund deliberately discarded the third hard drive after the court ordered him to turn it over to Boeing.

B.    *Legal Standard*

The court has the inherent authority to impose sanctions based on a party's failure to preserve relevant evidence. A party may only be sanctioned, however, if he had some notice the evidence was potentially relevant to pending or reasonably foreseeable litigation. *See United States v. $40,955.00 In U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); and *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir.

1992).

Sanctions may also be imposed under Rule 37 of the Federal Rules of Civil Procedure if a party destroys relevant evidence in violation of a discovery order. *Leon*, 464 F.3d at 958.

In this case, Boeing alleges intentional conduct by Berglund in discarding two hard drives prior to his January 2010 deposition; discarding a third hard drive following his January 2010 deposition, despite a court order to preserve the hard drive; deleting emails; altering other emails; and committing perjury by lying under oath about his misconduct involving the emails. Thus, the court has authority to impose sanctions against Berglund under Rule 37 for his destruction of the third hard drive after the court's March 2010 Order, and under the court's inherent authority for discarding two other hard drives, altering and deleting emails, and lying under oath to conceal his destruction and manipulation of evidence in an effort to support his claims against Boeing.

C.      *Analysis*

1.  Sanctions Pursuant to Rule 37

The law is clear that sanctions may be imposed under Rule 37 of the Federal Rules of Civil Procedure if a party destroys relevant evidence in violation of a discovery order. *See* FED. R. CIV. P. Rule 37(b)(2); *see also Leon*, 464 F.3d at 958. On March 11, 2010, this court ordered "the inspection of the personal computer or computers belonging to or in the possession, custody, or control of, plaintiff." *See Berglund*, 02-193-AC (docket # 167). Berglund did not indicate to the court at the time the hard drive in his personal computer was no longer available for inspection. Nor did Berglund subsequently submit any evidence to the court to show the third hard drive was not in existence at the time of the March 11, 2010, order for inspection. The third hard drive was never

produced to Boeing as directed by this court and, as such, Berglund violated the court's March 11, 2010, Order.

Berglund has offered no evidence that his failure to produce the hard drive was substantially justified. The fact that Berglund may have copied some of the data from the third hard drive to a thumb drive carries little force, as there can be no question the data transferred to a thumb drive from the third hard drive would be incomplete. The metadata would be missing and, more importantly, Boeing was entitled to more than what Berglund unilaterally determined was relevant. Such conduct – particularly in the larger context of Berglund's pattern of altering or destroying evidence related to his claims – undermines the integrity of the judicial process.

Importantly, Berglund produces no evidence or argument to justify or mitigate his conduct; indeed, he does not deny he destroyed the third hard drive. Further, Berglund offers no argument that persuades the court it would be unjust to impose sanctions for his conduct. Accordingly, sanctions are appropriate under Rule 37.

### 2. Sanctions Pursuant to the Court's Inherent Authority

A party has a duty to preserve evidence when it knows or reasonably should know the evidence is potentially relevant to litigation and when the destruction of that evidence prejudices the opposing party. *See Kitsap Physicians Serv.*, 314 F.3d at 1001 (A party "engage[s] in spoliation of [evidence] as a matter of law only if they had some notice that the [evidence was] potentially relevant to . . . litigation before [it was] destroyed."). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *World Courier v. Barone*, No. C 06-3072 THE, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007) (quotations and citation

omitted); *Performance Chevrolet, Inc. v. Market Scan Info. Sys.*, No. CV-04-0244-BLW, 2006 WL 1042359, at *1 (D. Idaho Apr. 18, 2006) ("The majority of courts have held that pre-litigation destruction can constitute spoliation when litigation was 'reasonably foreseeable' but not where it was 'merely possible.' " (citations omitted)). Thus, sanctions are appropriate if Berglund had knowledge and/or notice that the evidence in dispute was "potentially relevant" to probable litigation and Boeing was prejudiced by Berglund's conduct.

(a)  Notice

There is no dispute in this case Berglund had knowledge of the litigation at the time of his conduct. Indeed, the evidence tends to show it was the litigation that motivated Berglund's actions. By Berglund's own admission, he knew litigation was imminent by January 2002 (Berglund Dep. 55:23-58:9), yet the evidence shows Berglund altered or destroyed emails within a month of filing this action and he continued doing so after he filed his case. For example, Berglund altered the Lim-Berglund-Nilsen string on at least two occasions *after* January 2002 (Valerio Decl. ¶¶ 6(a)-(n)); he deleted 141 messages between January 2002 and February 15, 2002, and an additional 261 messages after he filed this suit. (Valerio Decl. ¶ 4.)  Finally, all three hard drives were destroyed after the litigation was filed, and Berglund's misrepresentations about his conduct occurred during his deposition in this case. The knowledge or notice requirement has been satisfied.

(b)  Prejudice

Prejudice is determined by looking at whether the spoilating party's actions impaired the non-spoilating party's ability to go to trial, threatened to interfere with the rightful decision of the case, or forced the non-spoiling party to rely on incomplete and spotty evidence. *Leon*, 464 F.3d at 959. Boeing points out that by altering and deleting email messages, Berglund has hampered its

ability to construct a complete account of events in this case. (Def.'s Mem. Sanctions 14.) Boeing thus will have difficulty in establishing an accurate account of Berglund's interactions with his colleagues, an important factor in defending against the retaliation claim. There is no doubt the authenticity and truthfulness of Berglund's evidence and testimony is highly suspect and, thus, Boeing's ability to marshal a complete defense has been compromised.

Next, by discarding the hard drives from his home computer, Berglund impaired Boeing's ability to obtain potentially relevant and discoverable communications. The January 7, 2008, email message in which Berglund calls Boeing "stupid" for rehiring him and speculates about a seven- or eight-figure settlement is stark evidence of such a consequence. Berglund's pattern of destruction and manipulation of evidence pertaining to his claims creates a reasonable inference that other potentially relevant evidence has been destroyed or lost by his conduct, thus further depriving Boeing of its ability to fully defend against his claims.

Additionally, in discarding the hard drives from his home computer, Berglund prevented Boeing from obtaining documents related to his 2003-04 job search and the work he performed for his wife's business. Berglund's damages claims are significant and his allegedly retaliatory lay off represents a material portion of those claims. Without the job search and mitigation documents, Boeing's mitigation defense is irreparably impaired by Berglund's misconduct in limiting the evidence available to Boeing to prove that defense.

By deleting email messages from his work computer and discarding the hard drives from his home computer, Berglund blocked Boeing's access to all potentially relevant evidence and prevented its defense team from accessing information that could be relevant to its defense. Such conduct creates suspicion that other pertinent evidence was available and establishes a reasonable

inference the information may have been useful to Boeing's defense. *See Leon*, 464 ("[B]ecause the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." (internal quotation marks and citation omitted)).

Finally, Boeing charges it has incurred substantial costs from Berglund's conduct in altering email messages and lying about the timing of those alterations. (Def.'s Mem. Sanctions 15.) Boeing contends Berglund gained an unfair tactical advantage by forcing Boeing to expend time and money ferreting out his misconduct. *See, e.g., Tesar v Potter*, No. 9:05-00956-SB, 2007 WL 2783386, at *8 (D.S.C. Sept. 21, 2007) ("[D]ishonest litigants have a distinct advantage over their honest adversaries, for the victimized opponent winds up . . . consuming substantial resources to respond to and 'undo' the victimizers' lies and distortions." (internal quotation marks, and citation omitted)).

Berglund attempts to neutralize Boeing's charge of prejudice by suggesting Boeing was provided both versions of the altered emails and it is free to argue those conflicts to the jury. Berglund also points out his *qui tam* action was dismissed, although he fails to explain how this circumstance reduces the prejudice to Boeing as it continues to defend against his retaliation claim. In any event, these arguments overlook that Berglund engaged in intentional misconduct which undermined the discovery process. Indeed, Berglund altered *original* emails and admitted knowing he was doing so. Further, Berglund lied under oath when initially asked whether his altered versions of the emails were true and accurate versions, and he lied about his misconduct regarding other evidence in this case.

The record reveals a pattern of tampering with and destroying evidence. Berglund attempted to create evidence favorable to his claims and conceal or destroy evidence that contradicted his

claims. The evidence he withheld or destroyed was relevant to his retaliation claim and Boeing's defense of that charge. Berglund does not dispute that he engaged in this misconduct but only attempts to explain why he did so. His explanations fail to remedy the result of his spoliation: a judicial process severely undermined and a fairly arrived at resolution of this case irreparably compromised. Accordingly, the court finds Boeing has made a showing of prejudice resulting from Berglund's conduct in this case. *See, e.g., Leon*, 464 F.3d at 959 (prejudice shown when "a party's refusal to provide certain documents 'forced [plaintiff] to rely on incomplete and spotty evidence' at trial" (citation omitted)); *United States ex rel Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988) (the prejudice inquiry "looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.")

D.    *Remedy*

Having determined: (1) Berglund destroyed, altered, and lied about evidence; (2) Berglund had knowledge and/or notice the evidence in dispute was "potentially relevant" to probable litigation; (3) Boeing was prejudiced by Berglund's conduct; and (4) Berglund defied an order to produce the third hard drive for inspection, the court must now decide upon the appropriate sanctions. Sanctions are warranted under both Rule 37 and the court's inherent authority. In addition to monetary sanctions, non-monetary sanctions under Rule 37 (b)(2) for a party's failure to comply with a court order include: (1) finding an issue to be established; (2) precluding evidence, a claim or a defense; (3) striking pleadings; (4) staying further proceedings; (5) dismissing the action; (6) rendering a default judgment; or (7) finding a party in contempt of court. FED. R. CIV. P. 37(b)(2)(A)(i)-(vii). In addition to the Rule 37 sanctions, available sanctions under the court's

inherent authority include:  (1) excluding spoiled evidence; (2) admitting evidence of the circumstances of the destruction or spoliation; or (3) instructing the jury that it may infer that the spoiled or destroyed evidence would have been unfavorable to the responsible party.  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  Finally, the severe sanction of dismissal is available when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  *Leon*, 464 F.3d at 958 (citation and internal quotations omitted).

Before a district court imposes the sanction of dismissal, it must weigh several factors:  "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.  *Anheuser-Busch, Inc. V. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).  Moreover, a finding of "willfulness, fault, or bad faith " is required before the district court may dismiss a party's claim.  *Id*. at 348 (quotations an citation omitted).  Lastly, due process concerns further require a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression "threaten[s] to interfere with the rightful decision of the case."  *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir. 1983).  *See also Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982) (default entry violated due process where the sanctioned party's deception was wholly unrelated to the merits of the controversy).

### 1.  Five General Factors

While a district court is not required to make explicit findings regarding each of the five

factors set forth above, the egregiousness of Berglund's misconduct, and its consequences to this

case and the judicial process, warrant discussing each of the five factors.  Turning to the first two

factors – expeditious resolution and managing the docket – there is no question Berglund's

destruction of three hard drives, deleting hundreds of emails, altering numerous other emails, and

lying in his deposition have "greatly impeded resolution of the case."  *See Malone v. U.S. Postal

Serv.*, 833 F.2d 128, 131 (9th Cir. 1987).  This case was filed almost ten years ago.  Over the course

of the proceedings, there have been many extensions of time granted for the parties to continue their

discovery efforts.  Berglund's deliberately deceptive conduct contributed to the lengthy delays in

this case, including requiring Boeing to expend considerable time and money to uncover the truth.

With respect to the third factor – prejudice to Boeing – the court already has found that Berglund's

conduct prejudiced Boeing.  *See* section IV.C.2.(b).  The fourth factor – public policy favoring

disposition on the merits – obviously would not be served by dismissal, but Berglund's continuing

misconduct in this case has made impossible a fair resolution on the merits and outweighs this

important policy.   On this point, the court notes the public policy factor, standing alone, is

insufficient to outweigh the other four factors if each is otherwise present.  *See Leon*, 464 F.3d at

960-61.  Finally, the fifth factor – less drastic sanctions – is discussed below in section IV.D.3.

### 2.  Willfulness, Bad Faith or Fault

"A party's destruction of evidence qualifies as willful spoliation if the party has some notice

that the documents were potentially relevant to the litigation before they were discarded."  *See Leon*,

464 F.3d at 959.  *See also In re Napster, Inc.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) ("As

soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows

or reasonably should know is relevant to the action.").  Motive or degree of fault in destroying the

evidence may be considered when choosing the appropriate sanction.  *See Advantacare Health Partners L.P. v. Access IV*, No. C 03-04496 JF, 2004 WL 1837997, *4 (N.D. Cal. Aug. 17, 2004).

Here, it is beyond dispute Berglund knew the evidence he was destroying or altering or lying about was potentially – indeed, actually – relevant to his claims against Boeing.  His intentional conduct of lying about the altered emails supports a finding Berglund understood the character and nature of his actions.  Despite clear notice, *i.e.*, the pendency of the litigation and the court's order of the need to preserve evidence in this case, Berglund elected to alter or destroy evidence and later lie about his conduct.  That is willful conduct, and Berglund makes no argument that, for purposes of this analysis, he did not act wilfully.

### 3.   Consideration of Lesser Sanctions

In considering the adequacy of less drastic sanctions before dismissing a party's case, the district court must:  (1) explicitly discuss the feasibility of less drastic sanctions and explain why such alternate sanctions would be inappropriate; (2) attempt to implement alternative sanctions before ordering dismissal; and (3) warn the party of the possibility of dismissal before ordering dismissal.  *See Anheuser-Busch, Inc.*, 69 F.3d at 352.

Dismissal is the appropriate sanction to address Berglund's pervasive misconduct here.  Stripped to its essence, what occurred here is this:  Berglund tried to cheat to win.  He did it knowingly, he did it on multiple occasions, he did it in violation of a court order, and he tried to conceal it all by lying about his conduct.  In so doing, Berglund permanently destroyed evidence relevant and potentially relevant to his claim and to Boeing's defense of his claim, and forever changed the evidentiary landscape of this case beyond the court's ability to adequately remedy.

The scale of Berglund's misdeeds renders inadequate a lesser sanction.  A monetary sanction

simply would put a price tag on a litigant's deliberate efforts to manufacture evidence. Having paid the ante for the privilege of continuing to litigate his case, Berglund would be free to pursue his claim on favorably altered or destroyed evidence and thus avoid a penalty commensurate with his misconduct.

The court rejects an adverse inference jury instruction as an appropriate sanction. Berglund's misconduct strikes at a fundamental principle of judicial proceedings: that courts are forums in which people may obtain fair resolutions of their disputes in accordance with rules intended to preserve that fairness. Courts have the inherent responsibility to protect the integrity of that forum and its processes, and courts should not abrogate that duty to a jury. The Ninth Circuit's well-established standard recognizes this responsibility: dismissal is warranted when "a party engage[s] deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch*, 69 F.3d at 348. Berglund did just that; his conduct here was deliberate, deceptive and pervasive, and attacked the integrity of the judicial process.

For the same reasons, other lesser sanctions would be inappropriate. Berglund made repeated efforts to destroy and fabricate evidence to further his lawsuit, conduct that subverts the judicial process. Litigants who deliberately engage in such egregious conduct as Berglund committed here should not be permitted to continue to benefit from the judicial process they have corrupted for personal gain.

The second and third criteria are inapplicable in this case. The court was unable to implement alternative sanctions because Berglund altered and destroyed and lied about evidence before the court was able to compel certain discovery or order a lesser sanction. *See Leon*, 464 F.3d at 960. Similarly, the court's duty to warn Berglund is inapplicable because Berglund's conduct

occurred prior to an opportunity for the court to warn against such deceptive practices. But it is unlikely Berglund would have heeded any such warning, as the record shows he continued his evidentiary manipulations even after this court's order to produce certain evidence. In any event, Berglund's conduct was secretive and unknown to the court until the present motion for sanctions was filed, thus rendering moot the question of whether the court had opportunity to either to implement alternative sanctions or warn Berglund. *Id.*

### 4. Nexus Between Sanction, Misconduct and Matters in Controversy

Due process concerns are not implicated here because of the close nexus between Berglund's conduct and the merits of his case. Berglund's conduct, among other things, includes attempts to suppress or destroy evidence showing that Boeing was in specification and engineering compliance, which goes directly to the merits of establishing a claim that he was retaliated against for reporting non-compliance. In addition, the evidence regarding Berglund's efforts to mitigate his damages that may have been on the destroyed hard drive(s) is relevant to Boeing's defense; as was the evidence of an email written to a third party bragging about a seven- or eight-figure settlement from Boeing in this case. Finally, neither the court nor Boeing can know the extent and relevance of all the missing or altered information, but certainly in light of Berglund's conduct in destroying that evidence, it is reasonable to presume that evidence was relevant to either the merits of Berglund's claim or Boeing's defense of that claim. *See, e.g., Leon*, 464 F.3d at 959 (the relevance of destroyed documents cannot be clearly ascertained).

### 5. Sanctions Levied

Under the circumstances of this case, the court will imposes two monetary sanctions and the sanction of dismissal. First, for violation of the court's order to produce the third hard drive for

inspection, monetary sanctions are awarded under Rule 37(b)(2)(C). Berglund, personally, is ordered to pay Boeing's reasonable costs and attorney fees arising directly from his failure to produce the third hard drive as directed on March 11, 2010. *See* FED. R. CIV P. 37 (b)(2)(C) ("court must order the disobedient party . . . to pay the reasonable expense . . . caused by the failure"). In addition, under the court's inherent authority, Berglund is ordered to pay Boeing's costs directly connected with the investigation and discovery of the altered emails, including the deposition preparation for and questioning of Berglund about the altered emails.

Finally, pursuant to the court's inherent authority, Count Two of Berglund's TAC is dismissed, with prejudice, as a sanction for Berglund's conduct of altering and deleting emails, discarding three hard drives, and lying under oath. The rules of civil procedure rules exist to guide parties through the litigation process in difficult cases and their obligation is to conduct themselves in a manner that protects the integrity of the process. Berglund intentionally acted to circumvent those rules, in disregard of the integrity of the judicial process. Such conduct transcends this case and severely damages the reliability of, and the public's confidence in, the judicial system. The penalty thus should hold Berglund accountable. Accordingly, Berglund's deliberate and deceptive practices directed at the merits of the controversy warrants dismissal of his retaliation claim.

## *CONCLUSION*

Based on the foregoing Boeing's Motion for Summary Judgment (doc. #171) is DENIED; Boeing's Motion for Sanctions (doc. #199) is GRANTED. Count Two of Berglund's TAC is DISMISSED, with prejudice, and JUDGMENT is entered for Boeing. Further, within 10 days of

this Opinion and Order, Boeing must file with the court a detailed statement of its requested fees and

costs for the monetary sanctions set forth above.

IT IS SO ORDERED

DATED this __13__ day of December 2011


_____/s/John V. Acosta_____
John V. Acosta
United States Magistrate Judge